NOT DESIGNATED FOR PUBLICATION

No. 119,761

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

MEGAN DANIELLE EULER,
*Appellant.*


MEMORANDUM OPINION

Appeal from Johnson District Court; BRENDA M. CAMERON, judge. Opinion filed February 7, 2020. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before SCHROEDER, P.J., MALONE and STANDRIDGE, JJ.


PER CURIAM: Megan Danielle Euler appeals her conviction of identity theft, and she raises two issues on appeal. First, Euler claims there was insufficient evidence to show that venue was proper in Johnson County. Second, Euler claims she should have been charged with and convicted of the more specific offense of criminal use of a financial card. We reject both of Euler's claims and affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

In July 2016, Anna Oman worked at Waddell & Reed, an investment firm in Johnson County. Euler worked one cubicle away from Oman. On July 2, 2016, Oman noticed a charge on her bank account that she did not make—$223.87 for Worlds of Fun made on July 1, 2016. Oman immediately made sure she still had possession of her debit card and then called Worlds of Fun. Worlds of Fun said they would "flag" the tickets in case someone tried to use them.

On July 4, 2016, Kansas City Police Sergeant James Slaughter was working off-duty at Worlds of Fun when he was called to the entrance because someone was trying to use voided tickets to enter the park. When Slaughter arrived, he saw Euler, her boyfriend Darrick Jones (Darrick), and some children. When Slaughter asked Euler where she got the tickets, Euler said she bought the tickets from a woman named Melissa Ralph on July 1, 2016. When asked, Euler denied that she worked at Waddell & Reed.

At the same time this investigation was occurring at the park, a security officer called Oman and notified her that Euler was trying to use the Worlds of Fun tickets. Oman then met with Overland Park Police Officer Donald Wasinger to report the incident. Wasinger forwarded the report to Overland Park Police Detective Lance Jordan in the financial crimes division.

Jordan obtained the Worlds of Fun ticket purchase records and found that the address listed in the purchase was for one of Oman's family members, the phone number was disconnected, and the email address could not be associated with anyone. Jordan tried to contact Euler by going to her house and calling her and Darrick, but neither of them ever contacted him.

On October 14, 2016, the State charged Euler with identity theft and theft of property. The State later amended the complaint to dismiss the theft charge. A jury trial was held on March 26, 2018.

Oman testified that she kept her debit card in her purse under her desk at work. Oman stated that on June 30, 2016, she received an email from Euler asking for her address so that Euler's daughter could send her something in the mail. In response to the email, Oman provided Euler with her home address, which is not the address she used for her official mailings. Oman used her parent's address as her official address and for her bank account. Oman testified that the billing address provided on the ticket purchase was her home address—the one she gave Euler and not the one she used for banking—and that the phone number and email address on the ticket purchase were not hers. Oman recalled that the week before the tickets were purchased, the company had an ice cream social outside, taking her away from her desk for some time. Oman went to the social with some friends and saw Euler come outside later. Oman also remembered seeing Euler with the Worlds of Fun website open on her computer a couple of times that week.

Erin Walton, who also worked at Waddell & Reed, testified that Euler sent her a Facebook message on July 4, 2016, about the ticket incident. Euler told Walton in the message that she was off work the day the tickets were bought and when she went to pick up her paycheck: "'[She] went upstairs to get [her] sunglasses and went to [her] desk, and there was an envelope sticking out from under the keyboard that said [her name] on it. . . . When [she] opened it in [her] car, there w[ere] Worlds of Fun tickets inside.'"

Slaughter and Jordan testified about their investigations. At the close of the State's case, Euler moved for a directed verdict based on lack of venue. The State argued that the evidence showed that Euler obtained the information to purchase the Worlds of Fun tickets at Waddell & Reed in Johnson County and thus venue was proper. The district court agreed with the State and overruled the motion.

3

Euler testified on her own behalf. She admitted that in 2016 she had financial problems. At the time, Euler lived in a house in Olathe, Kansas. Euler said she received gifts while working at Waddell & Reed, including gas cards and $200 tucked underneath her keyboard. Euler said there was not an event at work the week of July 1, 2016.

Euler testified that on July 1, 2016, she had the day off, so she went with her daughter, Camille Jones (Camille), to the DMV, where they waited for two to two-and-a-half hours for Camille's ID. After the DMV, they arrived at Waddell & Reed a little before 1 p.m. to pick up Euler's paycheck. Euler testified she stopped by her desk to grab her sunglasses when she saw an envelope underneath her keyboard which contained four Worlds of Fun tickets and a parking pass.

Euler testified that on July 4, 2016, she and Darrick went to Worlds of Fun with the children and when they got to the gate, none of the tickets worked. Eventually, police showed up and handcuffed Darrick. Euler testified that she told the officers that a year earlier, she met Melissa Ralph at Worlds of Fun because Ralph had a discount for tickets, so Euler gave Ralph money and Ralph bought some tickets for her. On cross-examination, Euler denied telling police that she got the tickets in question from Ralph and acknowledged that she did not mention the tickets were left under her keyboard at work. Euler said she lacked access to a computer unless she was at work and when asked how she sent Walton the Facebook message, she said she used a friend's computer.

Camille testified that on July 1, 2016, she went to the DMV with her mother to get her ID. Camille testified that she and Euler left their house around 10 a.m. and had to wait two hours at the DMV. After the DMV, they went to Euler's office and Euler came back to the car with two envelopes, one contained her paycheck and the other contained the Worlds of Fun tickets.

4

The district court instructed the jury on identity theft and the full statutory definition of "personal identifying information," including a person's name, address, and debit card information. The jury found Euler guilty of identity theft. On July 2, 2018, the district court sentenced Euler to 10 months' imprisonment but granted probation for 18 months. Euler timely appealed.

## WAS THERE SUFFICIENT EVIDENCE THAT VENUE WAS PROPER?

Euler first claims the State did not present sufficient evidence to show that venue was proper in Johnson County. Venue, unless specified in the statute, is not an element of the crime, but it is a necessary jurisdictional fact that must be proven by the State. *State v. Kendall*, 300 Kan. 515, 530, 331 P.3d 763 (2014). The proper venue for a criminal prosecution "shall be in the county where the crime was committed." K.S.A. 22-2602.

Euler was convicted of identity theft, which is "using . . . any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to . . . [d]efraud that person, or anyone else, in order to receive any benefit." K.S.A. 2018 Supp. 21-6107(a)(1). In addition to the general venue statute, "a prosecution for any crime committed with an electronic device may be brought in the county in which . . . [a]ny requisite act to the commission of the crime occurred." K.S.A. 2018 Supp. 22-2619(b)(1).

Euler argues that the State did not present sufficient evidence that she used personal identifying information to commit identity theft in Johnson County. She also argues that the State did not present "any forensic evidence" to show where the personal identifying information was used. Euler spends the remainder of her brief on this issue challenging the argument the State presented in the district court, i.e., that venue was proper based on Euler *obtaining* the information to commit identity theft in Johnson County. Euler asks this court to interpret the phrase "'requisite act to the commission of

5

the crime'" in K.S.A. 2018 Supp. 22-2619(b)(1) and determine that *obtaining* the information to commit identify theft could not be considered a "requisite act" establishing venue when she was charged with identity theft based on the *use* of that information.

But before this court, the State does not argue that obtaining the information in Johnson County provided the basis for venue. Also, the State does not rely on K.S.A. 2018 Supp. 22-2619(b)(1) to establish venue. Instead, the State argues that it presented sufficient evidence to establish Euler *used* the information in Johnson County because the evidence showed Euler bought the tickets the morning of July 1, 2016, and that she spent the entire morning in Johnson County, whether at her home, her work, or the DMV. The State concedes that there was no direct testimony that the DMV was in Johnson County, but the State argues that the jury could reasonably infer from the evidence and their common sense that the DMV was in Johnson County.

The standard of review for a claim of sufficiency of the evidence is well known:

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

The district court instructed the jury that to establish the charge of identity theft, the State needed to prove that Euler "*used* any personal identifying information or document containing personal identifying information belonging to or issued to Anna Oman." (Emphasis added.) Thus, Euler is correct that to establish venue the State needed to present sufficient evidence, in the light most favorable to the State, to show that Euler was in Johnson County when she *used* Oman's name, home address, and debit card to purchase Worlds of Fun tickets.

6

As to Euler's argument that the State did not present "any forensic evidence" to show where the information was used, Kansas courts have held that venue can be established by reasonable inference from other competent evidence; it need not be established by specific questions and answers. *State v. Calderon-Aparicio,* 44 Kan. App. 2d 830, 837, 242 P.3d 1197 (2010). Thus, the State did not have to provide forensic evidence to prove where the crime occurred. Instead, it need only establish by circumstantial evidence and reasonable inference that Euler used the information in Johnson County.

Here, it was undisputed that the Worlds of Fun tickets were purchased with Oman's debit card, name, and home address, at 11:53 a.m. on July 1, 2016. The State also established that (1) Euler worked one cubicle away from Oman at Waddell & Reed; (2) Oman kept her debit card in her purse at her desk; (3) Waddell & Reed had an outside event the week of July 1, 2016, and Euler came out later than everyone else; (4) Euler was on the Worlds of Fun website that week; and (5) the address used on the ticket purchase was the address Oman gave Euler, which is not the address she uses for her banking. In the light most favorable to the State, this evidence allows for a reasonable inference that Euler used Oman's personal identifying information to buy the tickets.

As to where Euler was when she used Oman's information, the evidence established that (1) Camille and Euler left their house in Johnson County around 10 a.m. on July 1, 2016; (2) they went to the DMV and were there for two to two-and-a-half hours; and (3) they arrived at Waddell & Reed, in Johnson County, shortly before 1 p.m. While there was no testimony about where the DMV was located, a reasonable fact-finder could infer that Euler would only go to the DMV in the county of her residence. Thus, in the light most favorable to the State, it is reasonable to infer that Euler was in Johnson County when she used Oman's personal identifying information. We conclude that the evidence was sufficient to show that venue was proper in Johnson County.

Euler argues for the first time on appeal that she should have been convicted of criminal use of a financial card because it is a more specific crime than identity theft. Euler argues that the court can address her issue for the first time on appeal because it is a question of law arising on proved facts and it is determinative of the case. See *State v. Williams*, 299 Kan. 911, 929-30, 329 P.3d 400 (2014). The State concedes that Euler can raise this issue for the first time on appeal.

Euler argues that she should have been convicted of criminal use of a financial card, under K.S.A. 2018 Supp. 21-5828(a)(1), because it is more specific than identity theft. Euler argues that identify theft criminalizes using any personal identifying information, which includes debit card information, with the intent to defraud, while criminal use of a financial card specifically criminalizes the use of personal identifying information from a financial card with the intent to defraud. Euler argues her conviction should be vacated or in the alternative she should be sentenced to the penalty for criminal use of a financial card.

The State argues that criminal use of a financial card is not a more specific crime of identity theft because the two offenses have different elements. The State argues criminal use of a financial card, unlike identity theft, requires the use of a financial card, proof of monetary loss, and lack of consent by the card owner.

A general law is "'[a] statute which relates to persons or things as a class'" and a specific law is "'a statute which relates to particular persons or things of a class.'" *State v. Campbell*, 279 Kan. 1, 12, 106 P.3d 1129 (2005). The rule "that a general statute should yield to a more specific statute that covers the same criminal conduct" is a rule of statutory interpretation used to determine which statute the Legislature intended to apply

8

in particular circumstances. *Williams*, 299 Kan. at 930. Although a general statute normally must yield to a specific statute, the rule "'must yield where there is a clear indication that the legislature did not intend for one statute to be the exclusive mechanism for punishing a given activity.' [Citations omitted.]" 299 Kan. at 930. Whether the rule applies is a question of law subject to unlimited review. 299 Kan. at 930.

Euler was convicted of identity theft under K.S.A. 2018 Supp. 21-6107(a)(1), which states: "Identity theft is . . . using . . . any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to: . . . [d]efraud that person, or anyone else, in order to receive any benefit." Personal identifying information includes: a person's name, address, and financial number, which includes a credit or debit card number. K.S.A. 2018 Supp. 21-6107(e)(2)(A), (C), (M). Identity theft is a severity level 8 person felony unless the monetary loss to a victim is over $100,000. K.S.A. 2018 Supp. 21-6107(c)(1).

Criminal use of a financial card is "[u]sing a financial card without the consent of the cardholder" "with intent to defraud and to obtain money, goods, property or services." K.S.A. 2018 Supp. 21-5828(a)(1). The severity level for criminal use of a financial card is based on the value of the money, goods, property, or services obtained. See K.S.A. 2018 Supp. 21-5828(b).

Euler argues that because she used Oman's debit card to purchase Worlds of Fun tickets for $223.87, she should have been charged with criminal use of a financial card since it more specifically addresses the facts of her case. Euler's argument oversimplifies the facts supporting her conviction for identity theft. Euler did more than just use Oman's debit card to buy the tickets. She also used Oman's name and home address. The prosecutor pointed out in closing arguments that Euler used Oman's name, debit card, and address. To find Euler guilty of identity theft, the jury had to find that she "used *any personal identifying information* . . . belonging to or issued to . . . Oman." (Emphasis

9

added.) The jury was then given the full statutory definition of personal identifying information which included, among other things, a person's name, address, or financial number, which includes debit cards. K.S.A. 2018 Supp. 21-6107(e)(2)(A), (C), and (M).

Using a person's name, address, and debit card number to defraud another person, as Euler did here, is beyond the conduct listed in the criminal use of a financial card statute and is directly addressed by the identity theft statute. So even if we were to decide that criminal use of a financial card is a more specific statute than identity theft when using another's debit card, it would not affect Euler's conviction because her identity theft conviction could have also been based on her use of Oman's name and address.

Even if we accept Euler's assertion that her conviction of identity theft was based only on her use of Oman's debit card, we disagree with her argument that criminal use of a credit card is a more specific offense. There is only one case addressing this issue, *State v. Granger*, No. 117,601, 2018 WL 5091591 (Kan. App. 2018) (unpublished opinion), which is cited by the State and not Euler. Granger used another person's debit card to purchase $700 in merchandise from Walmart and was convicted, along with other crimes, of identity theft. Granger argued that she should have been convicted of criminal use of a financial card because it is the more specific crime applicable to her conduct—using someone else's debit card to purchase merchandise—than the general offense of identity theft. The panel agreed:

> "As defined in K.S.A. 2017 Supp. 21-5828(a), criminal use of a financial card entails '[u]sing a financial card without the consent of the cardholder;' . . . with the 'intent to defraud' by acquiring 'money, goods, property or services.' Granger was charged with use of the debit card without McEnroe's consent. The elements of criminal use of a financial card, particularly as charged here, match elements of identity theft. But the identity theft statute covers far more wrongful conduct than does the financial card statute. For example, identity theft applies to all kinds of personal information, not just financial cards. . . . Similarly, defendants may be guilty of identity theft by engaging in a

10

wide range of activities related to personal identifying information, including but not limited to its use. A person buying or selling social security numbers or driver's license numbers would be guilty of identity theft but not criminal use of a financial card.

"In short, using a debit card as Granger did constitutes criminal use of a financial card that is also 'a specific instance' of more generally defined conduct criminalized as identity theft. Under K.S.A. 2017 Supp. 21-5109(d), Granger could have been convicted only of criminal use of a financial card and not use of personal identifying information as a form of identity theft for her unlawful purchases at Walmart." 2018 WL 5091591, at *4.

The *Granger* panel seems to have incorrectly focused on the existence of overlapping facts as opposed to properly applying the general versus specific definition and analysis. But simply because the facts of a case could fall within either statute, does not mean that criminal use of a financial card is a more specific statute than identity theft. See *State v. Garner*, No. 102,790, 2012 WL 4794448, at *14 (Kan. App. 2012) (unpublished opinion) ("The rule that the State must charge under a more specific statute when one exists does not mean that only one statute can apply to each crime."); *Coppage v. State*, No. 94,468, 2006 WL 1816394, at *4 (Kan. App. 2006) (unpublished opinion) ("Although the facts of a case may coincidentally fall within either of these statutes, the statute of aggravated assault on an officer is not the more specific statute of attempted first-degree murder.").

Instead, the proper analysis requires the court to first determine whether one statute, here identity theft, prohibits certain conduct generally, while the criminal use of a financial card statute prohibits identical conduct as related to a specific person or thing. See *State v. Cott*, 288 Kan. 643, 648-49, 206 P.3d 514 (2009). Stated differently, the specific versus general rationale applies when two statutes prohibit identical conduct and one statute applies to the public in general while the other statute applies to a specific group of offenders or victims. A few examples illustrate how the analysis is applied.

11

In *State v. Williams*, 250 Kan. 730, 829 P.2d 892 (1992), *superseded by statute as stated in State v. Toothman,* 310 Kan. 542, 448 P.3d 1039 (2019), the court considered whether aggravated incest was a more specific crime than indecent liberties with a child. The court determined that the two crimes were similar in the conduct they prohibited but "the distinguishing factor is that aggravated incest requires the act to be committed by a biological, step, or adoptive relative of the child." 250 Kan. at 736. Thus, the court found that aggravated incest was a more specific statute than indecent liberties because it prohibits the same conduct but applied to a specific group of offenders, those related to the victim. See 250 Kan. at 736.

In *State v. Creamer*, 26 Kan. App. 2d 914, 922, 996 P.2d 339 (2000), the court determined that a statute criminalizing injuring a human being while driving under the influence (DUI) was a general law, while a law criminalizing injuring a pregnant woman while DUI was a specific law. The court explained that this classification fit the general versus specific definition because the general law applies to human beings as a class and the specific law prohibits the same conduct related to a specific member of that class— pregnant women. 26 Kan. App. 2d at 922. Thus, when the victim was a pregnant woman, the more specific statute must apply. 26 Kan. App. 2d at 922.

In contrast, if the two statutes do not prohibit identical conduct, then the specific versus general rationale does not apply. In *Cott*, the court examined whether a sentencing enhancement statute for DUI with a child in the car at the time of the offense was a specific statute of aggravated child endangerment. 288 Kan. at 645. The court applied the *Williams* analysis and stated that for the specific versus general rule to apply it "would have to determine that the DUI sentence enhancement provision proscribes for a certain class of persons conduct which is proscribed generally in the child endangerment statute." 288 Kan. at 649. The court found that "the statutes created independent crimes and neither prevents the application of the other." 288 Kan. at 649. The court reasoned that the statutes were aimed at preventing different types of behavior because the sentencing

12

enhancement seeks to prohibit DUI while the child endangerment statute is directed at conduct that endangers a child. 288 Kan. at 649.

As in *Cott*, the identity theft statute and the criminal use of a financial card statute are aimed at preventing different types of behavior and thus the general versus specific rationale does not apply. The conduct prohibited by the identity theft statute is using another's "personal identifying information" to defraud that person or anyone else. The criminal use of a financial card prohibits the use of another person's financial card with "intent to defraud and to obtain money, goods, property or services." The focus is different, identity theft prevents the use of personal information or, put another way, it prevents an invasion of a person's privacy, while criminal use of a financial card merely prevents the wrongful procurement of money or property by using another's financial card. In identity theft, the debit card information is the thing being taken while in criminal use of a financial card, the financial card is the means by which the money, goods, property, or services are obtained.

In sum, Euler did more than just use Oman's debit card, she also used her name and home address when completing the ticket purchase. These other facts support her conviction of identity theft and would not support a conviction of criminal use of a financial card. Even if we accept Euler's assertion that her conviction of identity theft was based only on the use of Oman's debit card, we disagree with her argument that criminal use of a financial card is a more specific offense. Thus, we reject Euler's claim that she should have been convicted of criminal use of a financial card instead of identity theft.

Affirmed.